IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA NOTT | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11-2265 |
| THE READING HOSPITAL AND | : | |
| MEDICAL CENTER | : | |

## MEMORANDUM

**SURRICK, J.**                                                                                 **MARCH  14 , 2012**

Presently before the Court is Defendant's Motion for Summary Judgment.  (ECF No. 11.)

For the following reasons, Defendant's Motion will be granted.

## I.    PROCEDURAL HISTORY

Plaintiff filed the instant Complaint on March 30, 2011.  (Compl., ECF No. 1.)  Plaintiff

asserts the following claims:  religious harassment under Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") (Count I); religious discrimination under Title VII

(Count II); and retaliation under Title VII (Count III).  (*Id.*)  Defendant filed its Motion for

Summary Judgment on January 27, 2012 (Def.'s Mot., ECF No. 11), along with an

accompanying Memorandum of Law (Def.'s Mem., ECF No. 12).  Plaintiff filed her Brief in

Opposition to the Motion for Summary Judgment on February 10, 2012.  (Pl.'s Opp'n, ECF No.

17.)  Defendant filed a Reply Memorandum on February 24, 2012.  (Def.'s Reply, ECF No. 21.)

## II.    BACKGROUND[1]

Plaintiff is Jewish.  She is a registered nurse who was employed as a faculty member in

---

[1] We view of all of the facts and draw all reasonable inferences therefrom in the light
most favorable to Plaintiff, the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848,
852 (3d Cir. 2006).

Defendant's nursing school from 2004 until 2009.  On June 11, 2009, she was terminated.  (Nott Dep., Pl.'s Opp'n Ex. 1 at 14, 33.)  Plaintiff began employment with Defendant as a nurse educator, RN1.  She was promoted to RN2 and eventually to RN3, the position she held when she was terminated.  (*Id.* at 48-49.)  Plaintiff had received merit increases on February 6 and August 7, 2005, August 6, 2006 and August 5, 2008.  (Pl.'s Opp'n Ex. 9.)  Debbie Rahn, the Director of the nursing school at Reading Hospital, served as Plaintiff's supervisor from the early fall of 2007 until Plaintiff's termination in June of 2009.  (Rahn Dep. 23-24, 36-37, Pl.'s Opp'n Ex. 2.)  Prior to the fall of 2007, Rahn served as a curriculum coordinator.  (*Id.* at 23.)  Prior to Rahn assuming the role of Director, Joanne Kovach was Plaintiff's supervisor.  (*Id.* at 25.)  As Director, Rahn was responsible for the overall nursing program.  Her duties included the hiring, disciplining and firing of faculty.  (*Id.* at 37-38.)  Rahn also was responsible for providing performance reviews to faculty members.  (*Id.* at 39.)  Rahn belongs to the United Church of Christ.  (*Id.* at 6.)

A.     **The Religious Letter**

In September or October of 2007, Plaintiff received a handwritten letter of a religious nature in her work mailbox.  (Nott Dep. 103.)  Other faculty members also received the letter. The letter was not addressed specifically to Plaintiff, but "implored the reader to accept Jesus Christ into their lives in order to be saved."  (*Id.*)  Plaintiff does not remember the exact words, but thought that the letter implied that the failure to accept Jesus Christ would result in "eternal damnation."  (*Id.* at 103-04.)  Plaintiff testified that upon receiving the letter, she was hurt, angry, and a "little bit frightened."  (*Id.* at 106.)  Neither Plaintiff nor Defendant knows who authored or delivered the letter.  (*Id.* at 105; Rahn Dep. 213.)  Plaintiff brought the religious letter to the attention of Rahn, who was the Director of the nursing school at the time.  (Nott Dep. 119.)

2

Plaintiff thought that the letter was inappropriate and that it should be brought to the attention of the faculty.  (*Id.* at 119-20.)  Rahn refused to address the faculty about the letter.  (*Id.* at 120.)[2]  Plaintiff brought the letter to the attention of the faculty at the next faculty meeting.  (Nott Dep. 126.)   She told them that she was Jewish and that she thought that this type of communication was inappropriate.  (*Id.* at 130-31.)  Plaintiff testified that when she began to address the religious letter at the meeting, Rahn motioned to the recording secretary to stop taking minutes.  (*Id.* at 131.)  Rahn appeared to be disinterested and annoyed while Plaintiff was speaking about the religious letter.  (*Id.* at 84-85.)[3]  When Plaintiff was finished discussing the letter at the meeting, Rahn, in a condescending tone, asked if anyone had any questions.  (*Id.* at 135; Wise Dep. 87-88, Pl.'s Opp'n Ex. 7.)

Plaintiff also complained to Rahn about Dolores Callahan, a faculty member who repeatedly failed to attend class and played loud Christian music in her office.  (Nott Dep. 168-70.)  Callahan left her employment with Defendant in 2006.  (*Id.* at 169.)  Rahn had not yet been

---

[2] Rahn testified that she offered to report the letter to the faculty, but was not willing to blame the faculty as Plaintiff had requested, since there was no evidence that a faculty member was responsible.  (Rahn Dep. 215-16.)  Rahn further testified that her proposed approach in addressing the faculty was not acceptable to Plaintiff, so Rahn offered Plaintiff the opportunity to address them herself.  (*Id.* at 216.)

[3] Plaintiff's Opposition Brief contains a number of inaccuracies as to what the record reveals.  For example, Plaintiff states that Lori Wheeler, a faculty member, testified that Patricia Shaner-Christy, another faculty member, "rolled her eyes" when Plaintiff was addressing the religious letter at the faculty meeting.  (Pl.'s Opp'n 21 (citing Wheeler Dep. 35, Pl.'s Opp'n Ex. 8).)  Wheeler's testimony does not support this allegation.  Wheeler testified that she was not sure whether Shaner-Christy was even at the meeting, but that a "roll call" record which was taken at each faculty meeting would confirm her attendance.  For purposes of this Motion, we will only cite to those facts that are accurately supported by the record.  We continue to view the facts in a light most favorable to the Plaintiff; however, we will not adopt the inaccurate representations.

promoted to Director at the time that Plaintiff complained and at the time that Callahan left the nursing school.  (Nott Dep. 169; Rahn Dep. 23-24, 36-37.)

   **B.      Plaintiff's Allegations of Discrimination and Hostile Work Environment**

   After addressing the religious letter with the faculty, Plaintiff felt that she began to experience hostility and discrimination from other faculty members.  Particularly, Plaintiff believed that the demeanor of Rahn, Patricia Shaner-Christy and Nancy Paradis towards her changed.  (Nott Dep. 72-94.)   They would not joke around with Plaintiff or say hello to her when she passed them in the hallway.  (Wise Dep. 57-58; Wheeler Dep. 34, Pl.'s Opp'n Ex. 8.)

   Rahn began to "nit pick" Plaintiff's work.  (Nott Decl. ¶ 9, Pl.'s Opp'n Ex. 11.)  One example was that Rahn attended one of Plaintiff's lectures and noticed that a Power Point slide contained inaccurate information.  (*Id.*)  When Rahn pointed out the inaccuracy, Plaintiff proposed to email her class to let them know of the error.  Rahn responded that she did not like that idea.  (Pl.'s Resp. to 2009 Perf. Appraisal at LN0993, Pl.'s Opp'n Ex. 53.)  Other faculty members were permitted to correct mistakes by email.  (Wheeler Dep. 37-38.)  Rahn would also raise her voice at Plaintiff but not at other faculty members.  (Nott Dep. 419-20.)  On at least one occasion, Rahn hit her desk with her fists in Plaintiff's presence.  (*Id.*)  Rahn also required Plaintiff to prepare assignments while in the hospital, while other faculty members were permitted to prepare assignments at home.  (Nott Decl. ¶ 9.)

   Shaner-Christy became a faculty member with Defendant in June 2007.  She identifies herself as Lutheran.  (Shaner-Christy Dep. 6-8, 14-16, Pl.'s Opp'n Ex. 5.)  Plaintiff complains that Shaner-Christy became noticeably rude and disrespectful to her but did not act this way towards other faculty members.  During one encounter with Shaner-Christy, Plaintiff asked for

help in procuring keys to the clinical areas for her students.  (Nott Dep. 73.)  Shaner-Christy

replied with a sneer, "I would never do anything for you."  (*Id.*)  On another occasion, Shaner-

Christy told Lori Wheeler that Plaintiff requested to use "Paid Time Off" days ("PTO") for

Passover, slammed her book down and stated "I'll never do anything for [Plaintiff]."  (Wheeler

Dep. 15.)[4]  Plaintiff was not present for this conversation.  On another occasion, Shaner-Christy

criticized Plaintiff's use of PTO time during the semester.  (Nott Dep. 77-29.)  Plaintiff had used

approximately one week of PTO time to travel to Spain.  (*Id.* at 80.)  Plaintiff testified that

Shaner-Christy never indicated that her attitude towards Plaintiff was because Plaintiff was

Jewish.  (*Id.*)  Shaner-Christy never said anything demeaning to Plaintiff about her religion.  (*Id.*

at 81.)

Paradis became a faculty member with Defendant in August 2007, and identifies herself

as Christian.  (Paradis Dep. 6, 18, Pl.'s Opp'n Ex. 13.)  Plaintiff complained that Paradis was

also rude to Plaintiff.  She would not say hello to Plaintiff when they passed in the halls and

would not joke around with Plaintiff.  (Wise Dep. 58.)  On one occasion, Plaintiff was talking to

another faculty member about having to shoot a raccoon on her property because it was attacking

her dogs.  (Nott Dep. 86-87.)  Paradis overheard Plaintiff telling the story and responded to

Plaintiff, "they should have just shot you."  (*Id.*)  Paradis would not help Plaintiff with her

---

[4] Defendant had a procedure in place for employee requests to use PTO.  All employees
had to use PTO for most religious holidays.  Many faculty members used PTO for Good Friday.
(Def.'s Mem. Exs. 3 & 29.)  Easter typically fell on the nursing school's scheduled spring break.
On at least two occasions, Plaintiff's request was granted to use PTO for Passover.  Defendant
also has a policy where employees may substitute a religious holiday of their choice for one
where the employees already had off.  (Holiday Policy, Pl.'s Opp'n Ex. 7.)  Plaintiff was not
aware of this policy.

lectures, and criticized Plaintiff for being unprepared for lab.  (*Id.* at 88, 195.)

Plaintiff believes that there is a pervasive undercurrent of Christianity at the nursing school.  (Nott Dep. 114.)  Plaintiff points to a number of things that demonstrate the existence of this undercurrent.  For example, faculty members would scoff at the idea of having "holiday" parties as opposed to "Christmas" parties; employees complained that they were sick and tired of everyone taking the "Christ out of Christmas"; prayers were given at faculty and graduation dinners; Plaintiff was not allowed to say a Jewish prayer at these dinners; emails contained Christian content; the course schedule was manipulated so that Easter fell on spring break; and Bibles were passed out at new student orientations.  (*See* Pl.'s Opp'n 15-16 (citing Wise Dep. 75, 64-65; Nott Dep. 113-15, 166-67; Rahn Dep. 159-66.).)

### C.     The March 2009 Grievance Letter

On March 5, 2009, Plaintiff submitted a written grievance to Rahn, Thomas Hackett, Director of Human Services, and Donna Weber, Vice President and Chief Nursing Officer (the "Grievance Letter").  (Mar. 5, 2009 Email, Pl.'s Opp'n Ex. 34; Hackett Dep. 6, Pl.'s Opp'n Ex. 4; Weber Dep. 7, 60-62, Pl.'s Opp'n Ex. 7.)   The Grievance Letter is entitled "Horizontal and Vertical Violence," and is four pages long, single-spaced.  (Grievance Ltr., Pl.'s Opp'n Ex. 31.) The first paragraph of the Grievance Letter states that Paradis and Shaner-Christy have been increasingly hostile towards Plaintiff.  (*Id.*)  The Grievance Letter next mentions the religious letter that Plaintiff received in the fall of 2007:

> [In a]pproximately October/November of 2007 I showed Deb Rahn an anonymous letter of a religious nature that was placed in my mailbox and that of other faculty members at work.  I told her I thought it was inappropriate in the workplace and asked her to address the faculty regarding it.  She refused to, so I did.  I reminded the faculty that I am Jewish, and that all emails and hard-copy messages of a Christian nature should cease, period.  I stated that I respected their religious preferences and

that I expected the same respect from them.

(*Id.*)  The Grievance Letter then states that "[j]ust after this, [Paradis] became very vocal, asserting that there was much disorganization of" Plaintiff's classes.  (*Id.*)  The remainder of the Grievance Letter complains about not receiving an evaluation from Rahn during the 2007 academic year, despite Plaintiff's requests; Plaintiff's performance evaluation in 2008 being lower than it had been in previous years; Shaner-Christy's issue with Plaintiff's use of PTO time during the semester; Rahn's process for performance evaluations, which takes into account comments from other faculty members; Paradis' comment about the rabid raccoon; and the general hostility towards Plaintiff from Rahn, Paradis and Shaner-Christy.  (*Id.*)  The only portion of the Grievance Letter that relates to Plaintiff's religion is Plaintiff's mention of receiving the religious letter in 2007.  The word "discrimination" does not appear in the Grievance Letter. (*Id.*)

Plaintiff handed the Grievance Letter to Rahn in person when she met with her on March 5, 2009.  (Nott Decl. ¶ 7.)  The meeting was in response to a request by Plaintiff to teach upper level nursing courses.  (*Id.* at ¶¶ 1-4.)[5]  Rahn denied Plaintiff's requests due to Plaintiff's performance issues at the time.  (Nott Decl. ¶ 2.)  Plaintiff met with Rahn to discuss specific examples of performance issues.  (*Id.* at ¶ 4.)  Plaintiff advises that Rahn could not provide

---

[5] After Plaintiff was terminated, her replacement began to experience hostility from Paradis and Shaner-Christy, and was granted her request to switch to different courses so that she would not have contact with them.  (Van Horn Decl. ¶¶ 15-16, Pl.'s Opp'n Ex. 12.)  Plaintiff's replacement is believed to be non-Jewish.  (*Id.*)  Plaintiff alleges that this is evidence that non-Jewish employees were treated more favorably.

examples but instead raised her voice at Plaintiff.  (*Id.* at ¶ 6.)[6]  Rahn submitted a fourteen-page

response to the Grievance Letter, wherein she disputed the accusations contained in the Letter,

and predicted that Plaintiff submitted the grievance to protect herself from an unsatisfactory

review.  (Rahn Resp. to Grievance Ltr., Pl.'s Opp'n Ex. 44.)  Rahn explained in depth Plaintiff's

performance issues, including Plaintiff's lack of preparing and planning for her teaching

responsibilities.  (*Id.*)  Rahn also expressed surprise to see the circumstances surrounding the

religious letter contained in the Grievance Letter since Plaintiff "did not express dissatisfaction

with that plan and indeed thanked [Rahn] for giving her the opportunity to discuss" the letter

with the faculty.  (*Id.* at LN1175.)

Hackett investigated the Grievance Letter.  (Hackett Dep. 19.)  Hackett did not investigate

the religious letter given the amount of time that had passed between the time Plaintiff received

the religious letter and the time Plaintiff submitted her Grievance Letter.  (*Id.* at 42.)  The

investigation instead focused on the majority of Plaintiff's allegations, such as the interpersonal

relationships between Plaintiff and some of her co-workers.  (*Id.*)  Defendant issued a decision on

the Grievance Letter on March 29, 2009, which instituted the following actions:  (1) Rahn was to

instruct the other faculty members to provide respectful requests/responses to Plaintiff when they

have issues; (2) Rahn was to advise Shaner-Christy and Paradise to cease negative remarks and

behaviors towards Plaintiff; and (3) Plaintiff was encouraged to review her October 2008

performance evaluation.  (Grievance Decision Ltr., Pl.'s Opp'n Ex. 38.)

---

[6] Rahn disputes Plaintiff's statement that Rahn raised her voice and was unable to provide
examples.  (Rahn Dep. Vol. II at 315, Def.'s Mem. Ex. 2.)  Rahn testified that she did provide
examples, and that Plaintiff, in response, threw the Grievance Letter at Rahn and stormed out of
the office.  (*Id.*)

D.      **Performance Reviews**

Performance evaluations are prepared by the Director of the nursing school.  The

evaluations rate a faculty member's performance in various categories and weighs each category

to arrive at an overall performance score out of 100.  (Feb. 2005 Eval., Pl.'s Opp'n Ex. 18.)  Im

each performance category a score of one, two, or three, is given.  A score of one is given when

the performance is deficient, a score of two is given when the performance consistently meets

standards, and a score of three is given when the performance consistently exceeds standards.

(*Id.*)  A satisfactory overall weighted score is sixty-seven.  (*Id.*)  Comments are provided at the

end of each section, and at the end of the evaluation.  (*Id.*)

Plaintiff's first performance evaluation during her employment with Defendant was

prepared in February 2005 by Kovach, the Director at that time.  (*Id.*)  Plaintiff received an

overall performance score of 75.01, which included nine scores of three and no scores of one.

(*Id.* at LN0341.)  The comments for this evaluation were positive.  (*Id.*)  Plaintiff's second

performance evaluation was prepared by Kovach in August 2005.  (Aug. 2005 Eval., Pl.'s Opp'n

Ex. 19.)  On the August 2005 evaluation, Plaintiff received an overall performance score of

76.91, which included ten scores of three, and no scores below two.  (*Id.*)  The comments were

mixed.  One of the comments indicated that Plaintiff is approachable in the classroom and in the

clinical area.  (*Id.* at LN0353.)  Other comments stated:

> [Plaintiff] has discussed student progress with our instructors in a negative manner.
> . . .  [Plaintiff] has failed to show up at planned course meetings to discuss course
> development.  She is critical to another instructor who is late or absent from course
> meetings, but fails to look at her own behavior.  She has also missed faculty
> organization meetings . . . .  She left for summer vacation without submitting final
> grades for the summer session.  She needs to develop a plan for completion of
> responsibilities for each semester.  She is also extremely late in submitting her
> portfolio and goals for each academic year.

(*Id.* at LN00353-54)  The evaluation also explained that Plaintiff was completing her requirements for a Master's Degree in Nursing at DeSales University.  (*Id.*)

Plaintiff's third performance evaluation was prepared by Kovach in August 2006.  (Aug. 2006 Eval., Pl.'s Opp'n Ex. 20.)  On the August 2006 evaluation, Plaintiff received an overall performance score of 78.64, which included thirteen scores of three, and no scores below two. (*Id.*)  The comments on this performance evaluation showed improvement.  (*Id.* at LN0364 ("[Plaintiff] has shown much improvement in organizing her work responsibilities.").) Comments included that Plaintiff makes contributions in course and faculty meetings, and has a good working relationship with most instructors.  (*Id.* at LN062.)

No faculty member, including Plaintiff, received a performance evaluation in 2007. (Rahn Dep. Vol. II at 452, 502.)  During this time, Kovach retired as Director of the nursing school, and Rahn assumed the position of Director.  (*Id.*)  In the fall of 2007, Plaintiff's husband passed away suddenly and unexpectedly just before the start of the semester.  (Grievance Ltr.) Plaintiff's next performance evaluation was prepared by Rahn in August 2008.  (Aug. 2008 Eval., Pl.'s Opp'n Ex. 17.)  Plaintiff's overall score on the August 2008 evaluation was 68.33, which included two scores of three and no scores below two.  (*Id.*)  Comments from Rahn in this evaluation were mixed.  Rahn stated that Plaintiff "has extensive knowledge of nursing and demonstrates energy and willingness to teach others."  (*Id.* at LN0399.)  Rahn also commented that several areas require improvement by Plaintiff, including "(1) improving preparedness and planning and (2) using sound educational principles to guide teaching, decision-making and interactions." (*Id.*)  The August 2008 evaluation noted that Plaintiff would be reevaluated in six months.  After receiving this evaluation, Plaintiff requested that Rahn serve as her mentor, and

Rahn agreed.  (Nott Dep. 347-48.)

On February 24, 2009, Rahn emailed Plaintiff in response to Plaintiff's declaration that she was qualified to teach all upper level nursing courses with the exception of Psychology.  (Pl's Opp'n Ex. 30.)  Rahn stressed that Plaintiff needed to focus on her current courses and work on those issues addressed in her 2008 performance evaluation, notably disorganization, poor planning and lack of preparedness.  Rahn stressed that she would not consider moving Plaintiff to other courses until Plaintiff had improved in her current courses.  (*Id.*)

On April 6, 2009, Plaintiff received her six month follow-up evaluation.  (Apr. 2009 Eval., Pl.'s Opp'n Ex. 46.)  The April 2009 evaluation included a Corrective Action/Warning notification, and placed Plaintiff on probation.  Plaintiff's overall score on the April 2009 evaluation was 63.58, and revealed that Plaintiff was deficient in six categories.  The comments section stated:

> The areas requiring immediate improvement include (1) improving preparedness and planning in all areas of responsibility, (2) using sound educational principles to guide teaching and decision-making, (3) follow-through and completion of all assigned duties within the established time frames, (4) compliance with school and program policies and practices, and (5) improving interpersonal relationships to promote collegial environment and achieve program excellence.
>
> The result of this evaluation is to place [Plaintiff] on probation.  The next evaluation and reassessment will occur by August 2009, following the Academic Year.  Formal Evaluation may occur prior to that time if the situation warrants it.  Immediate and significant long-term sustained improvement is required to meet minimal standards of improvement.  Failure to significantly improve to meet the standards will result in additional disciplinary action which may include but is not limited to termination of employment.

(*Id.* at LN0508-09.)

### E.    Events Leading Up to the Termination of Plaintiff

On April 9, 2009, Hackett and Rahn met with Plaintiff and placed her on a ninety-day

Performance Improvement Plan ("PIP"), which addressed expectations during Plaintiff's probation.  (PIP, Def.'s Mem. Ex. 7.)  Plaintiff signed the PIP.  (*Id.*)  The PIP set forth specific performance requirements in all of the areas where Plaintiff received a deficient score.  (*Id.*)  The PIP also provided a schedule of meetings for evaluation of Plaintiff's performance under the PIP.  The plan did not guarantee the full ninety-day probationary period, but instead stated that if performance standards did not improve, the plan could be modified at any time and additional action could be taken.  (*Id.*)  Plaintiff failed to turn in the first assignment due under the PIP.  (Apr. 13, 2009 Email, Def.'s Mem. Ex. 8.)  Plaintiff continued to fail to turn in assignments due under the Plan.  (Rahn Notes, Def.'s Mem. Ex. 12.)   Plaintiff called in sick for four days and missed her first PIP meeting scheduled with Rahn.  (Apr. 16, 2009 Email, Def.'s Mem. Ex. 13.)  The meeting was rescheduled for April 23, 2009.  At that meeting, Rahn explained that Plaintiff had received "unsatisfactory" ratings in all categories on her PIP except for one during the first two weeks of her probation.  (Weekly Eval. on PIP 4/9-4/16, Def.'s Mem. Ex. 15; Weekly Eval. on PIP 4/17-4/23, Def.'s Mem. Ex. 17.)  In the following weeks, Plaintiff improved in some areas but continued to receive unsatisfactory ratings in many categories.

On April 22, 2009, Plaintiff's attorney sent a letter to Defendant's Human Resources Department.  The letter stated that since Plaintiff has been reporting to Rahn, she "has been subjected to a pattern of harassment as a result of her religion, Jewish."  (Att'y Ltr., Pl.'s Opp'n Ex. 61.)  The letter provided examples, such as requiring Plaintiff to use PTO time for Passover, while non-Jewish employees are permitted to take religious holidays without the use of PTO time; Rahn's refusal to investigate the religious letter; Rahn's refusal to address Plaintiff's complaint about the playing of loud Christian rock music by another employee; and "subjecting

[Plaintiff] to arbitrary, unsubstantiated work criticism to which other non-Jewish professors are not subjected." (*Id.*)

Plaintiff continued to receive poor ratings under the PIP throughout May. (May 21, 2009 Performance Appraisal, Pl.'s Opp'n Ex. 51.)  On May 29, 2009, Phillip Espinosa, Vice President of Human Resources, recommended that Plaintiff be terminated. (May 29, 2009 Mem. Pl.'s Ex. 56.)  The basis for the recommendation was that Plaintiff continued to receive unsatisfactory ratings on her PIP.  Plaintiff was terminated on June 11, 2009. (Not. of Term., Pl.'s Opp'n Ex. 57.)  The notice of termination states that Plaintiff is being terminated "due to unsatisfactory performance." (*Id.*)

Two other employees at Reading Hospital were terminated after failing to meet the requirements of PIPs.  Lenny Slemmer, a Christian, was placed on a PIP by Rahn and subsequently terminated in 2010. (Rahn Dep. Vol. II at 506-07; Nott Dep. 211.)  Similarly, Danielle Kranis, also a Christian, was terminated for failing to meet the requirements of a PIP instituted by Rahn. (Nott Dep. 280; Notes on Kranis' Perf., Def.'s Mem. Ex. 2.)  Kranis was criticized for, among other things, disorganization. (*Id.*)  Kranis was terminated in September 2008. (*Id.*)  Callahan, a born-again Christian, was not placed on a PIP despite repeated complaints about her performance issues. (Nott Dep. 53-66.)  Kovach was the Director at the time and had considered terminating Callahan for these performance deficiencies. (Kovach Dep. 40-41, ECF No. 22.)

## III.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

IV.   **DISCUSSION**

   A.   **Harassment Claim (Count I)**

   Plaintiff asserts that she "was subjected to a hostile work environment rife with religious

14

comments, religious actions, religious discrimination and retaliation . . . . " (Compl. ¶ 12.)
Defendant argues that Plaintiff's harassment claim is time-barred, or in the alternative, should be
dismissed because Plaintiff has failed to show that she suffered religious harassment.

1.      *Timeliness Of Claim*

Under Title VII, a plaintiff in Pennsylvania has 300 days "after the alleged unlawful
employment practice occurred" to file a charge of discrimination with the Equal Employment
Opportunity Commission ("EEOC").  *See* 42 U.S.C. § 2000e-5(e)(1); *see also Ruehl v. Viacom,
Inc.*, 500 F.3d 375, 383 (3d Cir. 2007) ("In deferral states, such as Pennsylvania, the charge must
be filed within 300 days of the allegedly illegal act.").  Absent a continuing violation, all
discriminatory acts that are alleged to have occurred more than 300 days prior to the EEOC filing
are time-barred.  *See AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002).  However, under a
continuing violation theory, a plaintiff's hostile environment claim is not time-barred "so long as
all acts which constitute the claim are part of the same unlawful employment practice and at least
one act falls within that time period."  *Id.* at 122; *see also O'Connor v. City of Newark*, 440 F.3d
125, 127 (3d Cir. 2006) (noting distinction between discrete acts which must be raised within the
applicable limitations period, and other acts which "can occur at any time so long as they are
linked in a pattern of actions which continues into the applicable limitations period").

Here, Plaintiff was terminated on June 11, 2009.  Plaintiff filed her charge of
discrimination with the EEOC on April 7, 2010, which is exactly 300 days from the date she was
terminated.  Plaintiff asserts a hostile work environment claim under the continuing violation
doctrine and alleges that Defendant's conduct that occurred prior to the termination supports her
religious harassment claim.  Plaintiff alleges the following conduct by Defendant in support of

15

her continuing violation claim for harassment:  Rahn's refusal to address the faculty about the religious letter; Rahn's conduct during the meeting when Plaintiff discussed the religious letter; Rahn's refusal to investigate the religious letter and an employee's playing of loud Christian rock music in her office; Rahn accusing Plaintiff of not attending meetings and not disciplining other faculty members for missing meetings; Rahn prohibiting Plaintiff from correcting a Power Point slide and making substantive evaluations about Plaintiff's work performance; employees' change in demeanor towards Plaintiff after she spoke about the religious letter; Shaner-Christy's rudeness towards, and refusal to accept help from, Plaintiff; Shaner-Christy expressing anger to another faculty member about Plaintiff's request to use PTO for Passover; Shaner-Christy telling Plaintiff that she would not help her with procuring mediation keys for her students or help her with anything; requiring Plaintiff to use PTO time for Passover; Paradise being rude to Plaintiff and making the racoon comment; Plaintiff's placement on probation; and the termination of Plaintiff.  (Pl.'s Opp'n 47-48; Compl. ¶ 12.)

Plaintiff's termination occurred within the applicable time period.  Thus, Plaintiff's harassment claim is timely and other acts that occurred outside of the limitations period may be considered to support her claim.  To the extent those untimely acts are discrete acts, which include "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation," *O'Connor*, 440 F.3d at 127, those acts are time-barred.  *See Morgan* 536 U.S. at 113 ("[D]iscrete discriminatory acts are time barred, even when they are related to acts alleged in timely filed charges."); *see also Mikula v. Allegheny Cnty.*, 583 F.3d 181, 186 (3d Cir. 2009) ("As determined by *Morgan*, the [continuing violation] doctrine does not apply to discrete, completed employment actions.").  We may,

however, consider those untimely discrete acts for evidentiary purposes to evaluate Plaintiff's

harassment claim. *See McCann v. Astrue*, 293 F. App'x 848, 850 & n.3 (3d Cir. 2008) (stating

that untimely discrete discriminatory acts "may not be aggregated under a continuing violation

theory," but "[t]hey may, however, be used as background evidence to support timely claims")

(not precedential).

2. *Substantive Elements of Claim*

Defendant argues, in the alternative, that Plaintiff has failed to show that she suffered

intentional religious harassment that was severe and pervasive.  A hostile work environment

claim exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation

omitted).  To survive summary judgment on a claim of religious hostile work environment,

Plaintiff must demonstrate the following elements:  "(1) intentional harassment because of

religion, that (2) was severe or pervasive, and (3) detrimentally affected [her], and (4) would

detrimentally affect a reasonable person of the same religion in that position, and (5) the

existence of respondeat superior liability."  *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 292

(3d Cir. 2009) (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276-77 (3d

Cir. 2001)).

Courts consider the totality of the circumstances when determining whether the conduct

is sufficiently severe and pervasive.  *See Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir.

2005); *Harris*, 510 U.S. at 23 ("Whether an environment is 'hostile' or 'abusive' can be

determined only by looking at all the circumstances.").  The types of circumstances district courts

17

consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Caver*, 420 F.3d at 263 (quoting *Harris*, 510 U.S. at 23).  Importantly, "'offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Id.* at 262 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Plaintiff has failed to establish that she suffered intentional harassment because of her religion that was severe or pervasive.  Most of Plaintiff's complaints center around Rahn, Shaner-Christy and Paradis being rude to her while not being rude to other employees.  There is simply no reasonable basis on which to support an inference that the demeanor of these individuals or their offhanded and isolated comments towards Plaintiff was motivated by anti-Jewish sentiment.  In fact, Plaintiff testified that Shaner-Christy never said anything to her that was "demeaning towards [her] because [she was] Jewish."  (Nott Dep. 81.)  Shaner-Christy's criticism of Plaintiff using PTO time had to do with missing classes during the semester since Plaintiff was using a week of PTO time to travel to Spain, and not because she was using PTO for Passover.  The evidence shows that Plaintiff requested PTO at least twice for Passover during her employment, and each time the request was granted.  Non-Jewish employees similarly used PTO time for religious holidays, and Easter typically fell during the nursing school's spring break.  Similarly, Rahn's refusal to address the faculty about the religious letter, and refusal to investigate the playing of loud Christian music by an employee, does not give rise to an inference of discrimination.  Rahn permitted Plaintiff to address the faculty about the religious letter.  Rahn may have appeared annoyed while Plaintiff was discussing the religious letter, but appearing

annoyed does not support an inference of discriminatory intimidation, or ridicule.  In addition, Rahn's failure to investigate the playing of Christian rock music does not implicate anti-Jewish sentiment.  More importantly, Rahn was not even the Director at the time when Plaintiff complained about the Christian rock music.  Kovach was the Director.

Even though the behavior of Rahn, Shaner-Christy and Paradis may have offended Plaintiff, it does not provide a reasonable basis upon which to conclude that their conduct created a workplace that was "permeated with [religious] discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris*, 510 U.S. at 21.  At best, the evidence shows that either Plaintiff was not well-liked by a few of her co-workers or that several of her co-workers were not very nice people.  Title VII is "not a general civility code."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). It does not grant employees the right to a pleasant work environment free from the rudeness of co-workers.

Accordingly, Plaintiff's hostile work environment claim will be dismissed.

**B.      Discrimination Claim (Count II)**

Plaintiff asserts that she was repeatedly and continuously subjected to discrimination because she was Jewish.  Plaintiff alleges that Defendant treated non-Jewish employees differently and that she was terminated on the basis of her religion while non-Jewish faculty members were retained.  (Pl.'s Opp'n 49.)[7]  Title VII makes it unlawful for an employer to

---

[7]  In her Complaint, Plaintiff alleges that she was "repeatedly and continuously subjected to discrimination on the basis of her religion throughout her employment" with Defendant. (Compl. ¶ 19.)  In her Opposition to Summary Judgment, Plaintiff has limited her discrimination claim to relate only to her termination.  Any alleged acts of discrimination that occurred prior to June 11, 2009 would be time-barred under 42 U.S.C. § 2000e-5(e)(1).  *See supra* § IV.A.1.

"discharge . . . or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of . . . religion." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's disparate treatment claim is analyzed under the burden-shifting framework of the Supreme Court's decision in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Abramson*, 260 F.3d at 281-82 (applying *McDonnell Douglas* framework to the plaintiff's religious discrimination claim). Under *McDonnell Douglas*, Plaintiff must first prove a *prima facie* case: (1) that she is a member of a protected class; (2) that she was qualified to hold her position; (3) that she suffered an adverse employment action; and (4) that "a similarly situated person outside of the protected class was treated more favorably." *Oakley v. Orthopaedic Assocs. of Allentown*, 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010) (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999)). If Plaintiff can prove her *prima facie* case, the burden shifts to Defendant to "proffer a legitimate, nondiscriminatory reason for the adverse employment decision." *Abramson*, 260 F.3d at 282 (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000)). Once Defendant offers a legitimate nondiscriminatory reason for the termination, the burden shifts back to Plaintiff to demonstrate that the reason offered was pretextual. *Id.*; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (noting that a plaintiff must prove pretext by a preponderance of the evidence).

Defendant argues that Plaintiff has failed to produce evidence sufficient to support the

---

Accordingly, the Court will limit its review of this claim to Plaintiff's termination; however, we may look to the untimely acts as background evidence to support her alleged discriminatory termination. *See McCann*, 293 F. App'x at 850 & n.3.

third element, that a similarly situated employee outside of the protected class was treated more favorably.  Employees are deemed "similarly situated" when (1) "they have similar responsibilities and are held to similar standards," and (2) "when their conduct on the job—or misconduct—is similar in nature."  *Oakley*, 742 F. Supp. 2d at 608; *see also Philpot v. Amtrak*, No. 10-1276, 2011 U.S. Dist. LEXIS 127615, at *19 (E.D. Pa. Nov. 3, 2011) ("[T]he Court must examine whether the employees engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal quotation marks omitted).  Courts also consider whether the employees reported to and dealt with the same supervisor.  *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (not precedential).

Plaintiff points to the following facts in support of her position that non-Jewish employees were treated more favorably:  Plaintiff's replacement was permitted to move to other courses so that she did not have to work with Paradis and Shaner-Christy, while Plaintiff was denied her request to change courses; other faculty members missed meetings and were not disciplined while Plaintiff was disciplined; other faculty members were permitted to correct mistakes, including mistakes to Power Point slides, that they made in class, without discipline, while Plaintiff was disciplined for such actions; Shaner-Christy and Paradis were "nasty" to Plaintiff but not to other faculty members; and despite repeated complaints about Callahan's performance, including her lack of attendance at classes meetings, Callahan was not placed on a PIP while Plaintiff was placed on a PIP.

Viewing the evidence in a light most favorable to Plaintiff, we are satisfied that a reasonable jury could not find that similarly situated employees outside of the protected class

were treated more favorably.  First, the fact that Plaintiff's replacement was permitted to switch

courses to avoid Paradis and Shaner-Christy is irrelevant.  Plaintiff points to no evidence that she

requested to switch classes in order to avoid these faculty members.  The evidence shows that

Plaintiff was denied her request to teach upper-level courses that she believed she was qualified

to teach.  (Pl.'s Resp. to Interrogatories No. 2, Def.'s Mem. Ex. B.)  Her request did not even

mention a desire to move away from courses where she would have to interact with Shaner-

Christy and Paradis.  The request was denied because Plaintiff was in need of improvement in

particular areas with respect to the courses she was currently teaching.  (Feb. 24, 2009 Email,

Pl.'s Opp'n Ex. 30.)[8]

Plaintiff's contention that Rahn reprimanded her for missing faculty and course meetings

while other faculty members who missed meetings were not reprimanded, is simply a

misrepresentation of the record not supported by the facts.  In the performance evaluations

prepared by Rahn, Rahn does not mention that Plaintiff failed to attend faculty or course

meetings.[9]  Rather, Rahn reveals that Plaintiff, on a number of occasions, had "missed

appointments" that she set up.  Missing scheduled appointments, particularly when Plaintiff is

_____

[8] Even if Plaintiff had requested a transfer into different courses for the purposes of
avoiding perceived religious hostility, Rahn's denial of her transfer is a discrete act and is
therefore time-barred to the extent that Plaintiff asserted a claim based on this denial.  *See
Morgan*, 536 U.S. at 114 (noting that "denial of transfer" and "failure to promote" are discrete
acts that must occur within the applicable limitations period or else are time-barred); *O'Connor*,
440 F.3d at 127 (describing termination, failure to promote, denial of transfer, refusal to hire,
wrongful suspension, wrongful discipline, denial of training, and wrongful accusation as a
"non-exhaustive list of discrete acts for which the limitations period runs from the act").

[9] In fact, Plaintiff is praised for her attendance record.  In Plaintiff's August 2008
evaluation, Rahn states that Plaintiff "[m]aintains expected attendance for all classroom, clinical,
and other faculty obligations."  (Aug. 2008 Eval. at LN0397.)

the one that set the appointment, is very different from missing faculty and course meetings. Plaintiff has pointed to no evidence that Rahn reprimanded her for missing course meetings or faculty meetings.  Although Plaintiff was criticized for missing meetings in her August 2005 evaluation, that evaluation was prepared by Kovach, not Rahn, and that evaluation pre-dates the religious letter and any allegations of religious hostility.

Plaintiff's example that Rahn did not allow her to correct a mistake on a Power Point slide while other faculty members were permitted to correct slides similarly does not support a showing that other similarly situated non-Jewish employees were treated more favorably. Plaintiff was reprimanded for giving false information to students.  The inaccurate information actually caused safety concerns because it misstated a nurse's obligations in monitoring a certain kind of anti-coagulation therapy.  (Rahn Dep. Vol. II at 568.)  Rahn provided the correct information to Plaintiff's students.  (*Id.* at 570.)  There is no evidence in the record that suggests that other non-Jewish faculty members were not reprimanded for providing false information to their students that caused safety concerns.  Furthermore, the fact that Rahn corrected Plaintiff's error, while other faculty members could simply correct mistakes to their students by email, does not suggest that Plaintiff was treated unfairly.  Finally, Plaintiff states that despite complaints that Callahan's performance was deficient, she was not placed on a PIP.  Plaintiff's argument is without merit.  Callahan was not supervised by Rahn, but rather by Kovach.  Callahan is not a similarly situated employee.  Further, Kovach testified that she did not recall whether she placed Callahan on a PIP but that she had suggested that Callahan be terminated for performance issues, including her lack of attendance at meetings.

Not only has Plaintiff failed to offer evidence that similarly situated employees who are

not in the protected class were treated more favorably, Plaintiff wholly ignores the fact that two

non-Jewish faculty members were placed on PIPs and terminated under the supervision of Rahn.

One of these employees, Kranis, was disciplined for performance deficiencies that were similar

to those for which Plaintiff was disciplined.

In any event, even if Plaintiff had established a *prima facie* case, Plaintiff has failed to

establish that Defendant's legitimate nondiscriminatory reasons for terminating Plaintiff were

pretextual.  Most significantly, Plaintiff's performance deficiencies began as early as 2005.  They

became worse in 2008 and 2009.  Plaintiff was repeatedly warned about her disorganization and

lack of preparedness and yet failed to show satisfactory improvement in these areas.  When she

was placed on PIP, she thumbed her nose at Defendant, failing to make any reasonable effort to

satisfy the requests of her employer.

Accordingly, Plaintiff's discrimination claim will be dismissed.

### C.       Retaliation Claim (Count III)

Finally, Plaintiff claims that she was terminated in retaliation for complaining about the

religious discrimination and harassment that she was subjected to during her employment.  There

are two ways for a plaintiff to prove a retaliation claim:  under a "mixed motives theory" and

under a "pretext" theory.  Plaintiff argues that she has presented enough evidence to proceed

under either theory.

####       *1.       Mixed Motives Theory*

Under the mixed motives theory, a plaintiff must put forth sufficient direct evidence that

"is so revealing of retaliatory animus."  *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d

Cir. 1997); *see also Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995)

(noting that in a mixed motives case, the employee must produce "more direct evidence than is required for the *McDonnell Douglas/Burdine* prima facie case").  If a plaintiff has produced sufficient direct evidence of discriminatory animus, the defendant must "produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision."  *Starceski*, 54 F.3d at 1096 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)).

Plaintiff alleges that the following constitutes direct evidence that supports her claim under a mixed motives theory:  Rahn's statement that "Ms. Nott would receive no satisfaction from her" on the Grievance Letter; Rahn's statement that the letter cannot be forgotten or undone and Rahn's response to the letter which Plaintiff claims "question[ed] the legitimacy of [Plaintiff's] request for Passover off and her religious beliefs."  (Pl.'s Opp'n 35.)  All of the evidence submitted by Plaintiff deals with the Grievance Letter.  Even if we accept these allegations as true, they do not reveal religious discriminatory animus.  Nor do they demonstrate that Defendant "placed substantial negative reliance on an illegitimate criterion," *Anderson v. Wachovia Mortg. Corp.*, 621 F.2d 261, 269 (3d Cir. 2010), in its decision to terminate Plaintiff.[10]

---

[10] The allegation that Rahn "question[ed] the legitimacy of [Plaintiff's] request for Passover off and her religious beliefs" is a misrepresentation of the record.  In response to Plaintiff's grievance, Rahn described an exchange between her and Plaintiff about the use of PTO for Passover.  (Rahn Ltr. Apr. 10, 2009, Pl.'s Op. Ex. 25.)  Rahn states that when Plaintiff asked to have off on Passover, Rahn told her she could, but that she had never requested off before, and all she needed to do was follow the process for using PTO, as is required for taking off for any religious holiday.  Rahn further stated that Plaintiff laughed and replied, "That's okay. I'm not really a practicing Jew."  (*Id.*)  Plaintiff has not disputed the fact that she made this statement to Rahn.  Instead, Plaintiff argues that Rahn is guilty of discrimination for questioning the legitimacy of Plaintiff's request for Passover.  The record does not support this assumption.

Moreover, as will be discussed more fully below, the Grievance Letter is not a form of protected activity under Title VII because it fails to convey a protest of discriminatory nature that put Defendant on notice that an unlawful employment practice had been advanced. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."). For this reason as well, the evidence that Plaintiff offers, all of which relates to Defendant's response to the Grievance Letter, is not sufficient to support a mixed motives theory.

      2.    *Pretext Theory*

Plaintiff argues that to the extent that the direct evidence fails to qualify under a mixed motives theory, she has offered sufficient evidence to survive summary judgment under the pretext theory. Under a pretext theory, Plaintiff must first make a *prima facie* showing of discrimination. This requires Plaintiff to show: (1) that she "engaged in a protected employee activity"; (2) that Defendant "took an adverse employment action after or contemporaneous with [Plaintiff's] protected activity"; and (3) a causal link between the adverse employment action and Plaintiff's protected activity. *Abramson*, 260 F.3d at 286. If Plaintiff submits enough evidence to establish her *prima facie* case, the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Starceski*, 54 F.3d at 1096 (citing *McDonnell Douglas*, 411 U.S. at 802). The burden of production then shifts back to Plaintiff who must show that Defendant's proffered explanation is pretextual or "incredible." *Id.*; *see also Oakley*, 742 F. Supp. 2d at 609.

Defendant argues that Plaintiff has failed to establish the first element—that she engaged in a protected activity—because the Grievance Letter does not qualify as protected activity under

Title VII.  Not every complaint or letter by an employee is protected by Title VII.  For a complaint to amount to a "protected activity" it must implicate an employment practice made illegal by Title VII.  *See Curay-Cramer*, 450 F.3d at 135; *see also Barber v. CSX Dist. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (dismissing retaliation claim because employee's letter to human resources department failed to allege age discrimination and was thus not a protected activity).  General complaints about unfair treatment are not protected.  *Barber*, 68 F.3d at 702.  The Grievance Letter complains generally about the "horizontal violence" that she felt from Paradis and Shaner-Christy.  (Grievance Ltr.)  The letter only briefly mentions "an anonymous letter of a religious nature."  (*Id.*)  Nowhere does the letter allege that Plaintiff was treated improperly because of her religion.  The letter does not even use the term "discrimination."  We are satisfied that the Grievance Letter is not a form of activity that Title VII is meant to protect.

However, the letter submitted by Plaintiff's attorney on April 22, 2009, does qualify as protected activity under Title VII.  That letter states that "[s]ince the time that [Plaintiff] has been reporting to Ms. Rahn, she has been subjected to a pattern of harassment as a result of her religion, Jewish."  (Att'y Ltr.)  This letter establishes the first element.  We must therefore consider whether there is a causal link between this protected activity and Plaintiff's termination.  Plaintiff was terminated on June 11, 2009, approximately fifty days after her attorney sent the letter to Defendant.  Defendant argues that the mere fact that the termination occurred less than two months after the letter is not sufficient to support a causal link because Defendant terminated Plaintiff for performance reasons, which pre-dated the letter.  "The mere fact that [an] adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."  *Reinhart v. Mineral*

*Tech., Inc.*, No. 05-4203, 2005 U.S. Dist. LEXIS 89279, at *34 (E.D. Pa. Nov. 27, 2006)

(quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other

grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  However, if the

timing of the alleged retaliatory action is "'unusually suggestive' of retaliatory motive," a causal

link will be inferred.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).  The Third

Circuit has found that two days is unusually suggestive, *see Jalil v. Avdel Corp.*, 873 F.2d 701,

708 (3d Cir. 1989), but that two months was not so close to be "unduly suggestive," *see Williams*

*v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004).

Defendant argues that complaints about Plaintiff's performance, which included criticism

that she was disorganized and not prepared, began as early as 2005 and became more intense in

late 2008, and early 2009.  Plaintiff received a poor evaluation on April 6, 2009, and was placed

on a PIP on April 9, 2009.  The April 2009 evaluation placed Plaintiff on probation and

contained a Corrective Action/Warning Notification, which stated that it was her final warning to

improve her preparedness and planning responsibilities, among other things.  The 2009

evaluation, placement on probation, final warning and placement on a PIP all pre-date the letter

submitted by Plaintiff's attorney.  We are satisfied, based upon all the evidence viewed in a light

most favorable to Plaintiff, that there is no causal link between the attorney's letter and Plaintiff's

termination.  Plaintiff has failed to establish a *prima facie* case of retaliation.

Even if we were to find that the fifty days in between Plaintiff's attorney's letter and her

termination was unusually suggestive of retaliatory conduct, Plaintiff's retaliation claim

nevertheless fails because Defendant has articulated a legitimate nondiscriminatory reason for

terminating Plaintiff and Plaintiff has not presented sufficient evidence showing that Defendant's

reasons were pretextual.  Once a plaintiff has established a *prima facie* case, the burden shifts to

the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment

action.  *See Starceski*, 54 F.3d at 1096.  Defendant has come forward with a reason for Plaintiff's

termination:  her repeated poor performance as shown on her evaluations, which pre-dated the

letter, as well as her total failure to perform under the PIP.  Plaintiff has failed to show that the

reasons for her termination were pretextual or at all motivated by discriminatory animus.  She has

failed to point to any "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions" in Defendant's legitimate nondiscriminatory reasons.  *Fuentes v. Perskie*, 32 F.3d

759, 765 (3d Cir. 1994).[11]

      Accordingly, the retaliation claim will be dismissed.

---

[11] In this regard, Plaintiff asserts that Defendant's reasons for terminating Plaintiff "changed over time" and that the ever-changing nature of their reasoning supports a finding of pretext.  We disagree.  Plaintiff's performance deficiencies and failure to improve upon specific areas noted in her PIP were consistently cited by Defendant as reasons for their decision to terminate Plaintiff.  In Rahn's email to Weber and Hackett that recommended that Plaintiff be terminated, she cited, among other reasons, Plaintiff's "continuing unsatisfactory work performance."  (Apr. 7, 2009 Email, Pl.'s Opp'n Ex. 50.)  In Espinosa's May 29, 2009 Memorandum recommending that Plaintiff be terminated, he stated that the basis for his recommendation was that Plaintiff continued to receive unsatisfactory ratings on her PIP.  (May 29, 2009 Mem.)  In Plaintiff's notice of termination dated June 11, 2009, Defendant stated that Plaintiff was being terminated "due to unsatisfactory performance."  (Not. of Term.)  The fact that Defendant gave other reasons in addition to Plaintiff's performance deficiencies in support of their decision to terminate her does not support a finding of pretext.

V.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted.

An appropriate Order follows.


                              **BY THE COURT:**


                              _____
                              **R. BARCLAY SURRICK, J.**